**John BERMINGHAM, Plaintiff,**

v.

**SONY CORPORATION OF AMERICA, INC., Sony U.S.A., Inc., Sony Corporation and Shinichi Takagi, Defendants.**

**Civ. A. No. 92–987 (AJL).**

United States District Court,
D. New Jersey.

Nov. 20, 1992.

Opinion on Denial of Reconsideration
March 19, 1993.

Robert E. Goldman, Speno Goldman Goldberg Steingart & Penn, P.C., Mineola, NY, for plaintiff.

Clyde A. Szuch, Gregory C. Parliman, Pitney, Hardin, Kipp & Szuch, Morristown, NJ, and Arnold I. Roth, Lauren Reiter Brody, Rosenman & Colin, New York City, for defendants.

## OPINION

LECHNER, District Judge.

This employment discrimination action[1] is brought by plaintiff John Bermingham ("Bermingham") against Sony Corporation of America, Inc. ("Sony America"), Sony U.S.A., Inc. ("Sony USA"), Sony Corporation ("Sony Japan")[2] (collectively, the "Sony Corporation") and Shinichi Takagi ("Takagi") (collectively, the "Defendants"), pursuant to section 1981 ("Section 1981") of the Civil Rights Act of 1866 (the "Civil Rights Act"), as amended,[3] 42 U.S.C. § 1981 et seq., 42 U.S.C. § 2000e et seq., as amended ("Title VII"), the New Jersey Law Against Discrimination (the "NJLAD"), N.J.S.A. 10:5–1 et seq., and New Jersey common law. Jurisdiction appears to be appropriate pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

Count I is a claim for violation of Section 1981 under both the Civil Rights Act and the 1991 Civil Rights Act. Id., ¶ 218. Count II is a claim for breach of an employment-at-will contract which also is alleged to violate the NJLAD and the federal public policy of Title VII.[4] Id., ¶ 225–228. Count III is a

1. The complaint in this action was amended on 16 March 1992 by the filing of the amended complaint (the "Amended Complaint"). The Amended Complaint is over sixty pages long and sets forth more than two hundred and sixty paragraphs of allegations. In fact, the Amended Complaint spans more than fifty pages of factual allegations before Count I is set forth. Based on the detail and length of the Amended Complaint and the fact that Bermingham has not filed a request to further amend the Amended Complaint, it is assumed that Bermingham cannot allege any additional facts.

2. Bermingham mentions the following "Sony" companies in his Amended Complaint:
 (1) Sony Corporation of America, Amended Complaint (the "Amended Complaint"), filed 16 March 1992, ¶ 4;
 (2) Sony Tape Sales Company, id.;
 (3) Sony Magnetic Products Group of America, id.;
 (4) Sony Electronics Group, id., ¶ 5;
 (5) Sony U.S.A., id., ¶ 10;
 (6) Sony Corporation, id., also referred to as Sony Japan, id., ¶ 16;
 (7) Sony Recording Media of America, id., ¶ 25;
 (8) Sony Engineering and Manufacturing of America, Id., ¶ 35;
 (9) Sony Recording Media Group.
 Id., ¶ 36.

Bermingham names only Sony America, Sony Japan and Sony U.S.A. as defendants in this action. He designates these three defendants as "Sony." Id., ¶ 10. The Amended Complaint makes its allegations against "Sony." It also refers to "Sony" at different times as the "corporate Defendants" and also as the "Defendant corporations." Id., ¶ 213, 214, 258.

3. The 1991 amendments to the Civil Rights Act will be referred to as the "1991 Civil Rights Act."

4. With regard to Count Two of the Amended Complaint, it is not clear what cause of action Bermingham is alleging. In order to demonstrate the lack of clarity with regard to this Count several portions of the Amended Complaint are quoted. The Amended Complaint states:

Plaintiff brings this action pursuant to § 1 of the Civil Rights Act of 1866, the Revised Statutes of 1977 and the Civil Rights Act of 1991 (42 U.S.C. § 1981, as amended), and the *Federal public policy* expressed in § 2000e–2 of Title VII of the Civil Rights Act of 1964, § 701, et seq., as amended (42 U.S.C. § 2000e–2) and as amended by the Civil Rights Act of 1991 (105 Stat. 1071, et seq.), and in New Jersey's Law Against Discrimination (N.J.S.A. 10:5–18), and pursuant to that Act directly, as well as New Jersey State common law principles of contract and tort.

claim for tortious discharge which is alleged to violate the public policies of both the NJLAD and Title VII.[5] *Id.,* ¶ 232. Count IV is a claim for breach of contract. *Id.,* ¶ 237. Count V is a claim for knowing and malicious defamation and slander. *Id.,* ¶¶ 241–243. Count VI is a claim for *prima facie* tort. *Id.,* ¶¶ 247–250. Count VII is a claim for intentional and malicious infliction of emotional harm. *Id.,* ¶ 253. Count VIII is a claim against Takagi for tortious interference with contract. *Id.,* ¶ 258.

Bermingham seeks fifteen million dollars in compensatory damages and one hundred million dollars in punitive damages on each of Counts I through VII. With regard to Count VIII, Bermingham seeks thirty million dollars in compensatory damages and thirty million dollars in punitive damages.[6]

Currently before the court is the motion of the Defendants to dismiss the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6).[7] For the reasons set forth below, the Defendants' motion is granted; the Amended Complaint is dismissed.

*Facts* [8]

*The Parties*

Bermingham is a forty-seven-year old caucasian. Amended Complaint, ¶¶ 15, 45. He resides in Kinnelon, New Jersey. *Id.,* ¶ 45. He was first employed by Sony Corporation in 1982 [9] and contends he developed an "im-

---

Amended Complaint, ¶ 1 (emphasis added).

Significant in the delineation of the Title VII claim is the repeated reference to how "[s]ection 2000e–2 of Title VII ... provides a clear and direct expression of the public policy of the Federal Government against employment discrimination based upon race or national origin." Amended Complaint, ¶ 227. Bermingham appears to be asserting his Title VII claim only upon the alleged "violations of expressed public policies of the ... United States Federal Government...." Amended Complaint, ¶ 230. Yet, Bermingham then alleges a claim for breach of contract. *Id.,* ¶ 229. It is not, therefore, clear if he in fact is attempting to allege a Title VII claim or a breach of contract claim.

When the papers Bermingham submitted for this motion are examined, it appears that he does not assert a Title VII claim, because the Title VII claim is not addressed in his opposition brief. Further support for this conclusion is found in the Table of Contents of his opposition brief. The Table of Contents of Bermingham's Memorandum of Law in Opposition to Defendant's Motion to Dismiss (the "Opp. Brief") addresses the substance of each Count, as set forth in the Amended Complaint. However, his delineation of what claims are raised in Count Two does not mention Title VII. He states: "Counts II and III Of Plaintiff's [Amended] Complaint State Valid Causes of Action Under New Jersey Law Against Discrimination/Breach Of Contract And Tort." Opp. Brief, Table Of Contents.

Even though the Amended Complaint and his papers are unclear as to what violations he is alleging, Title VII will be addressed.

5. This note is to be read in conjunction with the note 4. With regard to Count III of the Amended Complaint, it is also unclear as to what cause of action Bermingham is alleging. In order to demonstrate the lack of clarity in this Count additional portions of the Amended Complaint are quoted.

Significant in the delineation of the Title VII language of this count is the again repeated reference to the "expressed public policies of the ... the Federal Government under Title VII...." Amended Complaint, ¶ 232. Also significant is that Bermingham is stating a discrimination claim based upon the alleged "expressed public policies of the ... Federal Government[,]" yet, he alleges a claim in tort. Amended Complaint, ¶ 232–33.

As mentioned in note 4, despite the fact that Count III, like Count II, is unclear as to whether it asserts a claim under Title VII, Title VII will be addressed.

6. Bermingham's request for a total of one hundred and thirty-five million dollars in compensatory damages for Counts I through VIII and a total of seven hundred and thirty million dollars in punitive damages for Counts I through VIII is improper; it is not in accord with Rule 8(G) of the General Rules of the New Jersey District Courts of the State of New Jersey which prohibits such a demand for unliquidated damages.

7. In support of this motion, the Defendants submitted the following: Memorandum In Support of Defendants' Motion to Dismiss (the "Moving Brief") and the Reply Memorandum in Support of Defendants' Motion to Dismiss (the "Reply Brief").

In opposition to this motion, the Plaintiff submitted the Opp. Brief.

8. For the purposes of this opinion, the facts alleged in Complaint are taken to be true.

9. Bermingham places a heading in his Amended Complaint which states: "JOHN BERMINGHAM'S EMPLOYMENT BY SONY." Amended Complaint at 15. As indicated, Bermingham designates "Sony" as encompassing Sony Corporation (which he also refers to as Sony Japan), Sony U.S.A. and Sony America. *See* note 2. His employment by the different divisions of Sony

peccable employment history." *Id.,* ¶ 4. He received numerous commendations from superiors, who expressed expectations of his promotion. *Id.* He received numerous salary increases, bonuses and promotions stemming from his first position at Sony Corporation as Vice President of Sony Tape Sale Company ("Sony Tape") in 1982. *Id.* He became the President of Sony Tape in 1989 [10]. *Id.* Presently, Bermingham's position at Sony Corporation is Executive Vice President of Sony Electronics Group ("Sony Electronics"). *Id.,* ¶¶ 4, 5.

Sony Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan. *Id.,* ¶ 16. Sony U.S.A. is a wholly owned subsidiary of Sony Corporation. It is organized and exists under the laws of Delaware and has its principal place of business in New York City. *Id.,* ¶¶ 17, 20. Sony America is a wholly owned subsidiary of Sony U.S.A. It is organized and exists under the laws of Delaware and has its principal place of business in Park Ridge, New Jersey. *Id.,* ¶¶ 18, 19. Although Sony Tape and Sony Magnetic are not named in the Amended Complaint, they are mentioned. *Id.,* ¶ 21.

The top senior management of Sony Corporation is allegedly Japanese and the senior corporate structure of Sony Corporation is predominately Japanese. *Id.,* ¶¶ 22, 23. Sony Corporation is alleged to be comprised of "Japanese" companies. *Id.,* ¶ 24.

Takagi, the only individual named in this action, "is an employee and agent of" Sony Corporation. *Id.,* ¶ 25. He is the president of Domestic Sales and Marketing of Sony Recording Media of America ("Sony Media

America") and is the president and Chief Operating Officer of Sony Media America.[11] *Id.,* ¶ 25. Takagi is Japanese. *Id.,* ¶ 26.

The following individuals are mentioned in the Amended Complaint. Masaaki Morita ("M. Morita") is Chairman of the Board and Chief Executive Officer of Sony America, Sony Engineering and Manufacturing of America ("Sony Engineering and Manufacturing") and Sony Media America. *Id.,* ¶ 27. He is also the Vice Chairman of the Board of Sony USA. *Id.* M. Morita is Japanese. *Id.,* ¶ 28. Norio Ohga ("Ohga") is the Chairman of the Board of Sony USA. *Id.,* ¶ 29. Ohga is Japanese. *Id.,* ¶ 30. John Stern ("Stern") is the Executive Vice President of Human Resources at Sony America. *Id.,* ¶ 31. Stern's race is not alleged. Akio Morita ("A. Morita") is Chairman of the Board of Sony Corporation and an officer and director of Sony USA and Sony America. *Id.,* ¶ 32. A. Morita is Japanese. *Id.,* ¶ 33. Before 1 April 1989, John Hollands ("Hollands") was president of Sony Magnetic Products Group (the "SMPG"). Hollands' race is not alleged. Before 1 January 1992 Neil Vander Dussen ("Vander Dussen") was the Vice Chairman of Sony America, Sony Engineering and Manufacturing and Sony Media America. *Id.,* ¶ 35. His race is not alleged. Dr. T. Aoki ("T. Aoki") is Managing Director of Sony Recording Media Group ("Sony Recording Media"). *Id.,* ¶ 36. T. Aoki is Japanese. *Id.,* ¶ 37.

*Employment With Sony Corporation* [12]

In 1982, Sony Corporation hired Bermingham as a Vice President of Sales and Marketing for Sony Tape, a division of Sony

corporation will be referred throughout this opinion as being that of Sony Corporation.

It appears from the Amended Complaint, that Bermingham remains employed by Sony Corporation. He does not allege that he is or was unemployed.

10. Bermingham makes reference to this 1989 promotion. At different times in the Amended Complaint he refers to his 1989 promotion to President of Sony Magnetic and at other times in his Amended Complaint he makes reference to his 1989 promotion to President of Sony Tape. *See* Amended Complaint, ¶¶ 4, 81. It is not clear

from the Amended Complaint if Sony Magnetic and Sony Tape are the same or two subdivisions of Sony Corporation. To effect clarity, Bermingham's 1989 promotion will be referred to in this opinion as to that of President of Sony Tape.

11. For the purposes of this opinion, Takagi's positions at Sony Media America will be collectively referred to as being the Chief Operating Officer.

12. For a description of what Bermingham contends is his employment history prior to Sony Corporation, *see* Amended Complaint, ¶¶ 49–53.

America.[13] *Id.*, ¶ 55. Bermingham contends that "[i]t is precisely because of [his] proven talents and history of successful employment that he was hired by Sony [Corporation]." *Id.*, ¶ 54. During the nine years of his employment with Sony Corporation, Bermingham contends he was responsible at different times for the "sales, marketing, and distribution of magnetic media ... in the United States and, for a significant portion of that time, was also responsible for finance and operations." *Id.*, ¶ 85. Bermingham asserts he developed Sony Corporation's magnetic products business from a thirty million dollar business to a seven hundred and fifty million dollar business. *Id.*, ¶ 87.

In 1986 he "redeveloped Sony [Corporation's] professional video and audio tape business" turning it into the number one market share holder and "greatest profit producer for Sony [Corporation] in the Magnetic Products Group in the United States." *Id.*, ¶ 90.

In 1991 Bermingham further established strategic plans for Sony Corporation's entry into the American market for alkaline, lithium and rechargeable batteries. *Id.*, ¶ 91.

Bermingham contends his employment record with Sony Corporation indicates exceptional performance and he provides the following table for support:

| Areas of Performance | 1982 | 1990 |
|---|---|---|
| Sales | $30 M | $750 M |
| | | Constant $ = $2.8B |
| Audio Tape | 1% | 23% |
| Video Tape | 3% | 15% |
| Pro Tape | Single Digit | 24%–80% |
| Data Media | 0% | 20%–45% |

*Id.*, ¶ 92. To further evidence his track record at Sony Corporation, Bermingham refers to his salary increases, employment reviews and promotions.

On 1 September 1983, 1 September 1984 and 17 September 1985, he received "substantial salary increase[s]." *Id.*, ¶¶ 59, 60, 61. On 2 September 1986, Hollands reviewed his employment progress and stated: "Mr.

Bermingham's general performance is 'very good[, he n]ormally achieves objectives, budgets, sales, etc. leading to high rate of success, [and his s]pecial success was [the] 1986 national sales meeting.'" *Id.*, ¶ 62. Hollands listed Bermingham's "major strengths" in the following way: "1—product knowledge; 2—managing people; 3—presenting ideas and concepts; 4—interface with Japan;

13. While he was employed in this capacity, Bermingham contends he was shown a copy of the employment policies and guidelines (the "Employment Guidelines"). Amended Complaint, ¶ 56. He allegedly relied on the Employment Guidelines as a predicate to accepting the position. *Id.*, ¶ 57. It is alleged that on 6 May 1987, Sony Corporation revised its Employment Guidelines. Amended Complaint, ¶ 58. The revision allegedly involved the following areas: "Disciplinary Action: Performance & Conduct." This provision allegedly states:
 Employees may be terminated after being counseled for unacceptable performance or when conduct violations occur. Employment arrangements remain at will (i.e. not considered a contract for continued/future employment). Human resource approval is required.
*Id.* Additional revisions included:
 PERFORMANCE:
 Objective: Convert unsatisfactory behavior into productive performance.... All manag-

ers should give subordinates opportunities to improve.... Verbal and written communications should occur before any involuntary termination (methods may differ at manufacturing facilities):
 First, verbal counsel.
 Second, written counsel.
 Third, written warning and discharge consideration.
 NOTE: Any employee being counseled for unacceptable performance will not be allowed to transfer out of his/her department until improvement is noted for the file. *Unsatisfactory review or disciplinary memo must be placed in the employee's file.* ... Exception must be approved by Senior V-P, Human Resources.... Human Resource Director ... approves all terminations.
*Id.* (emphasis in text of Amended Complaint).

5—enthusiasm." *Id.*, ¶ 63. Hollands stated with regard to Bermingham's overall performance that he "meets targets; performed all assigned responsibilities and, accomplished all job objectives since the last review, [and] made effective contributions to the unit." *Id.* Bermingham alleges that, as a consequence of this review, he received an eight-thousand dollar salary increase in September 1986. *Id.*, ¶ 64. He also received another "substantial" salary increase one month later and a promotion to Senior Vice President of Sony Tape. *Id.*, ¶¶ 65, 66.

On or about 1 October 1987, Hollands again reviewed Bermingham's employment status. *Id.*, ¶ 67. It is alleged Hollands stated: "[Bermingham] consistently performs at high levels." *Id.*, ¶ 68. Hollands' review isolated Bermingham's major strengths as interfacing well with customers, other departments and Japan. *Id.*, ¶ 69. Bermingham was also considered to be excellent in dealing with human resource situations and with marketing programs. *Id.* Hollands concluded that Bermingham's next position "would logically be company or division President." *Id.* Hollands' 1987 review gave Birmingham the highest rating. *Id.*, ¶ 70. Bermingham's salary was again increased in 1987 and 1988. *Id.*, ¶¶ 71, 72.

Hollands next reviewed Bermingham's employment performance, on 11 November 1988. *Id.*, ¶ 73. Hollands stated: "[O]verall effectiveness very high; Sales are up; Cost are down; [and] Profits are up." *Id.*, ¶ 74. Hollands could describe no weaknesses in Bermingham's performance. *Id.*, ¶ 75. It is alleged Hollands also stated: "[W]ithin two years [he] should become a division or company head." *Id.*, ¶ 76. Bermingham contends that he was given the overall highest possible rating. *Id.*, ¶ 77. On 1 January 1989 and 1 April 1989, Bermingham's salary was increased. *Id.*, ¶¶ 78, 79.

On 1 October 1989, Bermingham's salary was raised for the third time in that year accompanied by a promotion to Executive Vice President of Sony Tape. *Id.*, ¶ 80. In 1989, Bermingham was promoted to President of Sony Tape with the approval of M. Morita and Vander Dussen.[14] *Id.*, ¶ 81.

On 1 April 1991, Bermingham received a seven percent salary increase and on 14 June 1991 he received an employment compensation bonus at ninety-five percent of the incentive plan, allegedly as an acknowledgment of his performance. *Id.*, ¶¶ 83, 84.

### *The Alleged Discrimination*

In January 1991, Bermingham was asked by Takagi to represent Sony Corporation and two divisions of Sony Corporation, Sony Energy Tech and Sony Magnetic, during the negotiations of a contract dispute with Time Craft Industry, Inc. ("Time Craft"). *Id.*, ¶ 93. In July 1991, a settlement was entered with Time Craft for five hundred and sixty thousand dollars. *Id.*, ¶ 94. The Japanese managers who caused the dispute with Time Craft were retained by Sony Corporation without demotion. *Id.*, ¶ 95.

As a result of the dispute with Time Craft, Bermingham contends he unknowingly became subject to a "secret scheme" instituted by Takagi to "destroy Bermingham's position, reputation, prestige and authority with Sony [Corporation]...." *Id.* The scheme allegedly stemmed from the racially motivated activities of Takagi and Sony Corporation. *Id.* Bermingham asserts he discovered the scheme in August 1991. *Id.*

To evidence the alleged discriminatory scheme, Bermingham contends that for the first six of his nine years with Sony Corporation, when he reported to Hollands, he never experienced an employment problem. *Id.*, ¶¶ 96–97. Bermingham again contends that prior to 1 April 1989 through 31 March 1990, when he reported to H. Akita, he never experienced an employment problem. *Id.*, ¶ 98. However, Bermingham contends that when Takagi became his supervisor in April 1990, his employment problems began.[15] *Id.*, ¶ 99.

---

**14.** Bermingham does not allege the specific date he was promoted to President of Sony Tape. It appears to have occurred between 2 October and 31 December 1989.

**15.** It appears that Bermingham, as President of Sony Tape, was a subordinate of Takagi, the president of Sony Magnetic.

Bermingham contends: "Virtually from the first moment ... Takagi, became ... Bermingham's ... supervisor, [Takagi] began a secret campaign to destroy Bermingham's career and position ... [and] ... his reputation, all premised upon ... [Takagi's] demonstrated history for racial intolerance with his caucasian subordinates and associates." *Id.,* ¶ 100. Takagi allegedly engaged in a pattern and scheme of defaming Bermingham. *Id.,* ¶ 101. Allegedly, Takagi questioned Bermingham's loyalty and capabilities by making defamatory statements [16] to Bermingham's associates, subordinates and superiors. Apparently, Takagi conducted himself in this manner without informing Bermingham or offering him counseling, as Bermingham contends is required by the Employment Guidelines. *Id.*

On 11 June 1991, Bermingham, while attending a meeting at a Sony Corporation plant in Dothan, Alabama, was told "he had a major problem with ... Takagi ... and [was] asked whether [he] was aware of the problem." *Id.,* ¶¶ 103, 104. He responded that he was not aware of a problem; however, he contends "the entire Japanese management of the company was aware of Takagi's secret campaign and his past history in this regard." *Id.,* ¶ 105.

On 14 June 1991, Bermingham and Takagi met. *Id.,* ¶ 106. At this meeting, Takagi told Bermingham that Sony Corporation, other Japanese management and "he w[ere] disappointed with Bermingham's management style and his ability to manage the business." *Id.,* ¶ 107. Takagi also stated: "[A]s far as Japanese management was concerned, Bermingham had no future" with Sony Magnetic or Sony Corporation. *Id.,* ¶¶ 106, 108. Bermingham's management style was apparently problematic [17] for the Defendants because he "had an inability to supervise his employees, ... failed to bring problems to his Japanese superior's attention," had an intimidating management style and developed extreme loyalty from his subordinates. *Id.,* ¶ 107. Bermingham, however, contends that Takagi's statements are belied by Bermingham's record at Sony Corporation. *Id.,* ¶ 114.

Bermingham further contends that, at the 14 June 1991 meeting, Takagi "physically demonstrated" contempt for him by sitting with his feet on his desk, looking out the window, playing on his computer and reading his mail during the conversation. *Id.,* ¶ 112.

Bermingham was "taken aback" by Takagi's statements during the 14 June 1991 meeting and alleges the statements were racially motivated and were designed to intimidate and humiliate Bermingham. *Id.,* ¶¶ 110, 111. Bermingham contends, "then and there, [they] actually and constructively terminated his position of authority ... because he was not Japanese." [18] *Id.,* ¶ 111.

**16.** The Amended Complaint states that Takagi engaged in defamatory conduct; however, it does not state whether he wrote or rather spoke about Bermingham.

**17.** Bermingham contends, that it was Takagi who had a management problem. Apparently, Takagi required subordinates to only keep him informed of key issues. Amended Complaint, ¶ 115. For example, it is alleged that Takagi never had staff meetings despite requests for them and attended monthly performance reviews for only one or two hours despite the fact that the meetings usually ran for approximately eight to ten hours. *Id.,* ¶¶ 116, 117, 122. According to Bermingham, Takagi "made it clear that he did not want to be involved in the everyday business affairs of the company." *Id.,* ¶ 118. Takagi left the everyday business affairs to his subordinates and left a "clear impression of an 'if I need more I will let you know' attitude." *Id.,* ¶ 118, 119. Bermingham contends that despite this detached management style, he met with Takagi on a nearly daily basis. *Id.,* ¶ 120.

**18.** Apparently, Bermingham is still employed by the Electronics Group, a division of Sony American, the wholly owned subsidiary of Sony Corporation. It is not alleged that he has lost employment or any compensation or benefits. Instead, Bermingham alleges that his status has been "diminished" and "continues until the present time." Amended Complaint, ¶ 194.

It seems that although Bermingham does not have the position with the attendant prerequisites or power he thinks he should have, he has not suffered any loss of compensation or benefits. It appears that his pride has been injured. *See Miller v. Aluminum Co. of America,* 679 F.Supp. 495 (W.D.Pa.) (lay-off was not adverse employment action where employee retained full salary and benefits; "temporary transfers or demotions which reduce the employee's duties and responsibilities but maintain her salary and benefits as before do not constitute adverse employment actions."), *aff'd,* 856 F.2d 184 (3d Cir.1988); *Churchill v. International Business. Machines, Inc., Nat. Service Div.,* 759 F.Supp. 1089, 1106

On 17 June 1991 Bermingham again met with Takagi to attempt to resolve the issues raised at the 14 June 1991 meeting. *Id.,* ¶ 138. Bermingham suggested a three to six month trial period and "assured Takagi ... he was ready to go forward in a positive manner." *Id.,* ¶ 140. Takagi merely reiterated the feeling he expressed at the 14 June 1991 meeting. *Id.,* ¶ 141.

Bermingham contends the 17 June 1991 meeting only repeated the humiliation and "utter defiance on the part of ... Takagi, for his caucasian subordinate...." *Id.,* ¶ 143. Takagi concluded the meeting by stating to Bermingham that "he would continue to think about the situation for a few days and get back" to him by 20 June 1991. *Id.,* ¶ 144.

At a 20 June 1991 meeting between Bermingham and Takagi, Takagi reiterated his earlier assessment of Bermingham's work. *Id.,* ¶ 163. Takagi concluded the meeting by telling Bermingham to find another position. *Id.,* ¶ 164.

Bermingham contends that despite these meetings, Sony Corporation failed to comply with the Employment Guidelines. *Id.,* ¶¶ 127, 142–43. Bermingham had asked for annual employment reviews from Takagi in March 1991, mid-April 1991, and early June 1991, but the reviews were put off by Takagi. *Id.,* ¶¶ 128, 130–31. He asserts that prior to the 14 June 1991 meeting, he was not informed in either verbal or written communications that there was any criticism of his performance or quality or quantity of the work he produced. *Id.,* ¶¶ 125, 126, 127, 143.

### Allegations of Takagi's Racial Intolerance

Takagi allegedly has a history of eliminating Americans from senior management and replacing them with Japanese management. *Id.,* ¶ 132. The conduct was allegedly based upon racial intolerance which had no expressed or implied intent to further a corporate goal. *Id.,* ¶ 133.

Bermingham contends Takagi treated Japanese managers differently than caucasian managers. *Id.,* ¶ 134. He specifically states that when there was a problem with a Japanese Vice President, Takagi reviewed the problem with the employee and specifically followed the Employment Guidelines. *Id.* In virtually every case involving a Japanese employee, it is asserted that the Japanese employee remained in his position.[19]

(D.N.J.1991) (no constructive discharge where plaintiff's new position involved fewer duties (citing *Pena v. Brattleboro Retreat,* 702 F.2d 322 (2d Cir.1983)) (change in responsibilities without pay reduction could not constitute constructive discharge); *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114 (1st Cir.1977) (loss of prestige or supervisory duties insufficient to support finding of constructive discharge)).

19. To further support the allegations that Bermingham was treated differently than a comparative Japanese manager, the Amended Complaint quotes a passage of a book co-authored by A. Morita, Chairman of the Board of Sony Corporation: *"The Japan That Can Say 'No'—The New U.S.—Japan Relations Card,"* published by Kobunsha Kappa–Holmes. Amended Complaint, ¶ 179.

American Corporate executives are of the opinion that it is a corporate right to pursue maximum profits and that fired workers should be able to live on their savings. However, people do not work for wages alone. Work has more meaning to most people than just as a means of subsistence. A Japanese worker has a sense of mission in holding his job for his lifetime as well as supporting the corporation which provides him with meaning to his life. This may well not be the case in America. American workers may only expect a comfortable wage for their work. However, this attitude could change. People can easily develop loyalty to a group or to a company to which they belong, depending upon conditions and guidance provided. This sense of loyalty is a formidable asset. Repetitive hiring and firing denies any possibility of cultivating a sense of loyalty.
I must ask American executives if they regard workers as mere tools which they can use to assure profits and then dump whenever the market sags. It seems that workers are treated simply as resources or tools rather than as human beings with inalienable rights. I would suggest that they should first do something to protect the human rights of workers in America before they start asking other nations to protect and enhance the human rights of their citizens....
When I first found that American companies can hire and fire and rehire at will, I wondered perhaps if Japanese companies were more charitable organizations that [sic] profit making institutions. However, Japanese managers have developed a concept which, in essence binds the company, workers and management, into a community.... I have explained to American corporate managers that in Japan, once an individual is hired, he has been hired for life and unless he commits some serious offense, the company cannot fire him....
When I find an employee who turns out to be wrong for a job, I feel it is my fault because I

*Allegations of Continuing Violation Through Ratification*

Bermingham contends the discrimination practiced by the Defendants is continuing. *Id.,* ¶ 135. The continuation of the discrimination is allegedly evidenced by the failure of the other Defendants to rectify the situation with Takagi despite Bermingham's willingness to continue to work with Takagi. *Id.,* ¶¶ 135, 137. The substance of the following meetings with various Sony Corporation people is offered to evidence this contention.

In June 1991 Vander Dussen contacted Bermingham and expressed how "upset" he was over the situation with Takagi. *Id.,* ¶ 136. In later conversations, Vander Dussen stated he did not agree with Takagi and that it was a "Japanese thing." *Id.,* ¶ 157. He further told Bermingham he "felt ... Bermingham had done a great job at Sony [Corporation] and ... that what was happening ... was totally unfair" and was "at the hands of Japanese management." *Id.,* ¶ 169. Vander Dussen stated he could not change the minds of Japanese management. *Id.* Vander Dussen also stated he would attempt to protect Bermingham's family and Bermingham financially; however, he recommended Bermingham look for another position. *Id.,* ¶ 158.

On 17 June 1991, Bermingham met with Stern. *Id.,* ¶ 145. Stern informed Bermingham that Takagi, six to eight months earlier, had expressed dissatisfaction about Bermingham's work and that it was not something recent. *Id.,* ¶ 146. Allegedly, Stern further informed Bermingham that he was in "total disagreement with Takagi's assessment." *Id.,* ¶ 147.

Bermingham then met with M. Morita on 24 June 1991 and Bermingham sought to present to senior Japanese management his

made the decision to hire him. Generally, I would invest in additional training, education, or change of duty, even perhaps sending him overseas for additional experience....
The confidence of Japanese employees in their company, knowing that he [sic] is employed for life, means that he will develop a strong sense of dedication to that company. For these reasons, Japanese corporate executives are anxious to train their employees well, as they will be their successors.

perception of the Takagi situation. *Id.,* ¶ 165. M. Morita allegedly expressed how "upset he was for the situation," and that he did not understand the reasoning behind Takagi's conduct. *Id.,* ¶ 166. It is also contended M. Morita further stated he did not understand the factual basis for Takagi's expressed problems with Bermingham's management style. *Id.,* ¶¶ 166, 167. Bermingham complains that despite these statements, M. Morita was "either unable (or unwilling) to change Takagi's mind in this matter" and he gave Bermingham the impression he would not intercede to halt the alleged "illegal and improper action." *Id.,* ¶ 166. It is asserted these meetings apparently demonstrate that "[n]ot only did Sony [Corporation] management take no steps to halt the ... improper actions, they specifically ratified and perpetuated" it. *Id.,* ¶ 161.

Takagi, it is further asserted, is "allied with the Tokyo inner circle and, in particular, ... Ohga, Chairman of the Board of Sony [Corporation] ... and, thus, Bermingham [did] not anticipate that Takagi's actions would be reversed." *Id.,* ¶ 150. Bermingham contends that other Japanese managers supported Takagi. *Id.,* ¶ 151.

Bermingham also contends the ratification of the actions taken by Takagi is further evidenced by the following alleged offers by Sony Corporation to enter into what Bermingham terms new contractual relationships with him. *Id.,* ¶ 135. On 15 July 1991, Vander Dussen announced that Bermingham was taking a corporate staff position as an Executive Vice President. *Id.,* ¶ 172. A corporate release read:

SONY STATEMENT—July 16, 1991
Effective July 15, ... Bermingham has assumed a new position of Executive Vice President in the Sony Electronics Group on an interim basis. He will be handling a

*Id.,* ¶¶ 180, 181 (quoting *"The Japan That Can Say 'No' "* at 40, 45, 46). Although Bermingham does not allege that this passage is in fact Sony Corporation's employment policy, he does allege that the practices articulated in this passage concerning reciprocal employer/employee loyalty were not applied to Bermingham by Japanese senior management. *Id.,* ¶ 182.

variety of assignments for top management while evaluating potential new operational responsibilities for Sony [Corporation].

Also effective July 15, the responsibilities for sales and marketing for Sony Magnetic ... will be assumed to ... Takagi, President.

... Bermingham joined Sony [Corporation] in 1982 as Vice President, [of] Sony Tape ..., [and has] ris[en] to Senior Vice President in 1986 and was appointed President in 1989. During this nine year period his efforts have contributed significantly to the growth of magnetic products business.

*Id.* (the "16 July Corporate Release"). It is alleged that by making this assignment, the Japanese executive management ratified the conduct of Takagi. *Id.,* ¶ 183.

Bermingham, however, contends that the new position, as Executive Vice President, had no subordinates, no authority, no mission and no agenda. *Id.,* ¶ 173. The assignment was allegedly a humiliating demotion and a constructive termination and a discharge which gave Bermingham at most "an empty desk, a secretary, and no future." *Id.,* ¶¶ 175, 189. Significantly, however, notwithstanding all of the voluminous allegation in the sixty-three page, two hundred and sixty-one paragraph Amended Complaint, Bermingham does not allege either that he is no longer employed by Sony Corporation or that he has suffered financially as a result of the change.

Bermingham states he was qualified for the position from which he was removed and that Takagi was not qualified to replace him because of Takagi's racial bias and discrimination. *Id.,* ¶¶ 190, 206. Bermingham contends the decision to replace Bermingham with Takagi "speak[s] volumes" of the alleged history of Japanese discrimination by Takagi and Sony Corporation. *Id.,* ¶ 196.

It is further asserted that an offer to transfer (the "Transfer Offer") Bermingham to California, made on 2 March 1992, also evidences the ratification of the discriminatory actions taken by Takagi. *Id.,* ¶¶ 210, 211. Accordingly, Bermingham asserts Sony Corporation engaged in continuing racially discriminatory conduct. *Id.,* ¶ 214.

Bermingham also contends that the failure to remove Takagi and send him back to Japan for retraining evidences ratification of Takagi's actions. *Id.,* ¶ 207. Bermingham was advised that other people wanted Takagi to return to Japan for management retraining because of his particular problem in dealing with caucasian subordinates. *Id.,* ¶ 152. Takagi apparently refused to return for retraining. Takagi was allegedly "designated [the] 'hatchet man' to systematically eliminate targeted caucasian managers." *Id.,* ¶ 153. The Japanese executive management allegedly ratified the conduct of Takagi because of their alleged awareness of Takagi's inability to fulfill his managerial duties without expressing racial bias and discrimination. *Id.,* ¶ 202, 203, 207. Bermingham, therefore, contends that the failure of Japanese management to remove Takagi and reinstate Bermingham to his "rightful" position also constitutes ratification of Takagi's actions. *Id.,* ¶ 210. Bermingham does not allege in the Amended Complaint that any racially biased statements were made or that such documents exist. At best, he alleges his feelings and beliefs. In substance, it appears Bermingham experienced a personality conflict with Takagi.

*Additional Allegations*

Bermingham further asserts that the assignment to the new position of Executive Vice President was defamatory of his reputation both in and out of Sony Corporation. *Id.,* ¶ 177. Bermingham maintains that the assignment to the new position was intentional, malicious and purposeful and, as a result, it caused him great humiliation and embarrassment. *Id.,* ¶¶ 197, 198. He allegedly suffered a loss of business reputation and esteem in both Sony Corporation and the electronics industry. *Id.,* ¶ 198. Bermingham contends he suffered emotional trauma and expense to vindicate himself. *Id.*

*Discussion*

The Defendants argue the Amended Complaint should be dismissed pursuant to Rule 12(b)(6). Moving Brief at 10.

### A. Standard of Review

■■ A court may dismiss a complaint for failure to state a claim where it appears

beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1395 (3d Cir.1991); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). In deciding such a motion under Fed.R.Civ.P. 12(b)(6), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. *Gomez v. Toledo,* 446 U.S. 635, 636 n. 3, 100 S.Ct. 1920, 1921 n. 3, 64 L.Ed.2d 572 (1980); *Markowitz,* 906 F.2d at 103; *Melikian v. Corradetti,* 791 F.2d 274, 277 (3d Cir.1986), *petition for cert. filed* (6 June 1990); *Robb v. Philadelphia,* 733 F.2d 286, 290 (3d Cir. 1984). Nevertheless, legal conclusions made in the guise of factual allegations are not given the presumption of truthfulness. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 2944, 92 L.Ed.2d 209 (1986); *Haase v. Webster,* 807 F.2d 208, 215 (D.C.Cir.1986); *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Western Mining Council v. Watt,* 643 F.2d 618, 626 (9th Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).

A federal court reviewing the sufficiency of the complaint has a limited role. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *see also Estate of Bailey v. County of York,* 768 F.2d 503, 506 (3d Cir.1985).

## B. *Employment Discrimination*

A plaintiff bringing an employment discrimination suit may bring suit under both Title VII and Section 1981. *See Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975).

Bermingham's Title VII claims are not clearly set forth in Counts II and III. *See supra* notes 4–5. However, his Section 1981 claim is explicitly set forth as Count I. Even though it appears he is not alleging Title VII claims, it will be assumed that he has and such Title VII claims will be addressed.

### 1. *Title VII*

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin...." [20] 42 U.S.C. § 2000e–2(a).

■ It is settled that the statutory scheme of Title VII favors the voluntary resolution of employment discrimination disputes. *Waiters v. Parsons,* 729 F.2d 233, 237 n. 9 (3d Cir.1984) (per curiam) ("The favored means of resolving employment discrimination disputes is a mutually acceptable resolution, worked out informally under the aegis of the EEOC [Equal Employment Opportunities Commission (the "EEOC") ]."); *see also Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974) ("Cooperation and voluntary compliance were selected [by Congress] as the preferred means for achieving" the goal of elimination of employment discrimination.).

■ Title VII's statutory scheme "reflects an attempt to balance the competing values" of protecting employees from discrimination and of avoiding the cost of litigating employment decisions that might be resolved voluntarily. *Waiters,* 729 F.2d at 237 n. 9. Title

---

**20.** Title VII provides, in pertinent part:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(a).

VII establishes a "comprehensive scheme" for resolving complaints of employment discrimination. *Johnson,* 421 U.S. at 457–58, 95 S.Ct. at 1718–19.

A plaintiff commencing an action under Title VII "must file a timely charge with the EEOC ... before initiating suit in federal court." *Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1210 (3d Cir.1984) (citing *Love v. Pullman,* 404 U.S. 522, 523, 92 S.Ct. 616, 617, 30 L.Ed.2d 679 (1972)); *Lewis v. Swindell Dressler Int'l Co.,* No. 91–1580, 1992 WL 165791, 1992 U.S.Dist. LEXIS 7830 (W.D.Pa. 23 Mar. 1992); *Miller v. Beneficial Management Corp.,* 776 F.Supp. 936, 959 (D.N.J.1991), *rev'd on other grounds,* 977 F.2d 834 (3d Cir.1992).

Despite Bermingham's references in Counts II and III of the Amended Complaint to the public policies of the Federal Government as expressed in Title VII, Bermingham fails to allege any facts that he, as required under Title VII, filed a charge with the EEOC within three hundred days of "the alleged unlawful practice." 43 U.S.C. § 2000e-5(e); *see Miller.,* 776 F.Supp. at 959. Because there is no mention or discussion at all in the Amended Complaint about Bermingham having filed charges with the EEOC, his claims under Title VII, if any, are premature. Accordingly, Bermingham fails to state a claim under Title VII. Any Title VII claims which may be raised in Counts II and III are dismissed.

### 2. *Section 1981*

■ With regard to Section 1981, the Defendants argue Count I of the Amended Complaint should be dismissed because Bermingham's allegations fail to state claims upon which relief can be granted. Moving Brief at 11. The Defendants further argue the 1991 Civil Rights Act should not be retroactively applied and the standard set forth in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), should control the analysis of this case. *Id.*

Bermingham argues he has set forth a cognizable claim under Section 1981 of the pre–1991 Civil Rights Act and under the 1991 Civil Rights Act. Opp. Brief at 1, 15. He argues he was discriminatorily denied a promotion, terminated [21] and entered into a new contractual relationship with Sony Corporation. *Id.* He further argues he was denied the right to enforce his contract because he was denied access to the procedures set forth in the Employee Guidelines. *Id.* at 1, 13. As to the viability of his claims under the 1991 Civil Rights Act, he argues Sony Corporation's alleged maintenance of the "status quo" constitutes a continuing violation which is presently actionable because it relates back to the alleged discrimination by Takagi. *Id.* at 1, 16–17. He further argues the Transfer Offer is a present distinct violation of Section 1981. *Id.* at 16.

Before Bermingham's alleged Section 1981 discrimination claim can be addressed it must be determined if the 1991 Civil Rights Act should be applied retroactively.[22]

#### a. Retroactivity

The Senate passed its version of the 1991 Civil Rights Act on 30 October 1991 and the House of Representatives passed the Senate's version of the 1991 Civil Rights Act on 7 November 1991. On 21 November 1991, the President signed the 1991 Civil Rights Act [23]

---

21. There is nothing in the Amended Complaint which alleges that Bermingham was terminated.

22. The effective date of the 1991 Civil Rights Act provides:
 (a) In General. Except as otherwise specifically provided, this Act and the amendments made by this Act *shall take effect upon enactment.*
 (b) Certain Disparate Impact Cases. Notwithstanding any other provision of this Act, nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983.

Civil Rights Act of 1991 § 402, 105 Stat. 1071 (emphasis added).

23. Section 102(c) of the 1991 Civil Rights Act amends 42 U.S.C. § 1981 to include the following language:

 (a) Right of Recovery.—
 (1) Civil Rights.—In an action brought by a complaining party ... against a respondent who engaged in unlawful intentional discrimi-

into law. It amended Section 1981 [24] of the Civil Rights Act of 1866. *See Tyree v. Riley*, 783 F.Supp. 877 (D.N.J.1992).

Prior to the 21 November 1991 amendments, application of Section 1981 to employment discrimination claims was governed by *Patterson*, 491 U.S. at 164, 109 S.Ct. at 2363. *Patterson* limited the application of Section 1981 to racial discrimination arising out of the making and enforcing of contracts. 491 U.S. at 179, 185, 109 S.Ct. at 2374, 2377. The petitioner in *Patterson* was harassed, not promoted and terminated from her employment because of her race. "This type of conduct," the Supreme Court stated, "reprehensible ... if it be true, is not actionable under [Section] 1981, which covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process." *Id.* at 179–180, 109 S.Ct. at 2374. *See, e.g., Bennun v. Rutgers State University*, 941 F.2d 154, 168 (3d Cir.1991) ("*Patterson* limited [S]ection 1981's reach to racial discrimination in the making and enforcing of contracts."), *cert. denied,* —— U.S. ——, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992); *Hayes v. Community General Osteopathic Hospital*, 940 F.2d 54, 56 (3d Cir.1991) (*Patterson* applies to the making and enforcing of contracts), *cert. denied,* —— U.S. ——, 112 S.Ct. 940, 117 L.Ed.2d 110 (1992); *Fray v. Omaha World Herald Co.*, 960 F.2d 1370, 1372–73 (8th Cir.1992) (*Patterson* limits Section 1981 to claims showing refusal to enter employment contracts on the basis of race); *Revis v. Slocomb Industries, Inc.*, 765 F.Supp. 1212, 1213–14 (D.Del.1991) (*Patterson* narrows reach of Section 1981 to employment discrimination suits involving rights to make and to enforce contracts); *Thompson v. Johnson & Johnson Management Info. Ctr.*, 725 F.Supp.

826, 826–27 (D.N.J.1989) (*Patterson* delineates parameters of Section 1981 with respect to employment discrimination where the protections of Section 1981 redress discrimination in the making and enforcement of contracts).

The 1991 Civil Rights Act was in part a response to this interpretation of the scope of Section 1981. *See Fray*, 960 F.2d at 1373. Relevant to this case is Section 1981(b), [25] of the 1991 Civil Rights Act, which expands the definition of "mak[ing] and enforc[ing] contracts" to include post-formation conduct, including the modification and termination of contracts and the enjoyment of all terms and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

Critical in the analysis of this case is whether the expanded definition of "mak[ing] and enforc[ing] contracts" applies retroactively to cases instituted after the enactment of the 1991 Civil Rights Act which are based on conduct that occurred prior to the amendments enactment.

The 1991 Civil Rights Act has engendered debate regarding whether it should be applied retroactively. *See, e.g., Thompson v. Johnson & Johnson*, 783 F.Supp. 893, 894 (D.N.J.1992). Although the Third Circuit has not addressed whether the 1991 Civil Rights Act should have retroactive effect in pending or post-enactment cases arising from pre-enactment conduct, it has been determined at the District Court level that it should not. *See Tyree*, 783 F.Supp. 877; *see also Newark Branch, NAACP v. West Orange*, 786 F.Supp. 408, 430 n. 25 (D.N.J. 1992).

*Tyree* determined that prospective application of the 1991 Civil Rights Act is the preferred approach in cases which were pending

nation ... the complaining party may recover compensatory damages....

. . . . .

(c) Jury Trial. If a complaining party seeks compensatory or punitive damages under this section—
 (1) any party may demand a trial by jury....
Civil Rights Act of 1991 § 102(c), 105 Stat. 1071.

**24.** Section 1981 provides in pertinent part:

All persons ... shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full

and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....
42 U.S.C. § 1981.

**25.** Section 1981(b) provides:

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
42 U.S.C. § 1981(b).

when the Act was enacted. 783 F.Supp. at 892; *see also Johnson & Johnson,* 783 F.Supp. at 898–99; *Thomas v. Frank,* 791 F.Supp. 470 (D.N.J.1992); *Thompson v. Prudential Ins. Co. of America,* 795 F.Supp. 1337 (D.N.J.1992). *Tyree* also noted, that the "same rationale and holding would apply to cases instituted after the enactment of the 1991 Civil Rights Act based on conduct that occurred prior to its enactment.". *Tyree,* 783 F.Supp. at 878 n. 3; *see also Crumley v. Delaware State College,* 797 F.Supp. 341 (D.Del.1992).

*Johnson & Johnson* involved a plaintiff's efforts to have the 1991 Civil Rights Act applied retroactively to a Section 1981 wrongful termination claim. 783 F.Supp. 893. The plaintiff commenced his first action on 26 January 1986. *Id.* That action was dismissed on 20 November 1989 pursuant to the rule articulated in *Patterson,* "that [S]ection 1981 'covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal proceedings.'" *Id.* at 894 (quoting *Patterson,* 491 U.S. at 179–80, 109 S.Ct. at 2374). Following the enactment of the 1991 Civil Rights Act, the plaintiff reinstituted the action, seeking to have the 1991 Civil Rights Act retroactively applied. In denying the plaintiff's request, the *Johnson & Johnson* court stated:

> The Third Circuit has made clear ... that "when application of the new law would affect rights or obligations existing prior to the change in law," the rule of nonretroactivity applies. In the instant case, plaintiff's claim pursuant to 42 U.S.C. § 1981 addresses conduct that the section did not proscribe at the time the conduct occurred. Thus, the rights and obligations in this case were predicted on the pre-amendment statute. Therefore, ... this court ... find[s] against retroactive application.

783 F.Supp. at 897 (citations omitted).

*Thomas* concerned an action commenced on 7 January 1991 for violation of Title VII of the Civil Rights Act of 1964 on the basis of gender, religion and retaliatory discrimination. 791 F.Supp. at 471. The plaintiff later moved for leave to amend her complaint to include demands for a jury trial and compensatory damages as provided by the 1991 Civil Rights Act. *Id.* The *Thomas* court determined that the retroactive application of the 1991 Civil Rights Act "would infringe upon the established, recognized rights of the Defendant ..." and "impose new, unanticipated obligations upon the Defendant." *Id.* at 475–76. Because the court determined the retroactive application of the 1991 Civil Rights Act was inappropriate, the request for leave to amend the complaint was denied.

In *Crumley* the court consolidated three actions which raised the issue of whether the 1991 Civil Rights Act would be retroactively applied to conduct occurring prior to its enactment. 797 F.Supp. at 343. The *Crumley* court held that the 1991 Civil Rights Act would not be retroactively applied "to cases involving conduct occurring prior to the enactment of the 1991 [Civil Rights] Act irrespective of whether suit was filed in federal court prior to or subsequent to the Act's enactment." *Id.* In reaching this determination the court stated:

> [P]assage of the 1991 Act does not alter a plaintiff's right to be free from discrimination ...; ... passage of the Act does, however, impose a new obligation on a defendant to pay compensatory and punitive damages. Accordingly, the court concludes that to apply the 1991 Act retroactively would impact substantially on defendant's previous rights.... Moreover, retroactive application of the 1991 Act can not deter discriminatory conduct which occurred prior to the passage of the act.

*Id.* at 352. Accordingly, the court declined to apply the 1991 Civil Rights Act retroactively.

Section 1981(b) of the 1991 Civil Rights Act will not be applied retroactively because this case is based on conduct which occurred prior to the enactment of the 1991 Civil Rights Act.

b. Continuing Violation and the 1991 Civil Rights Act

■ Bermingham contends that Sony Corporation's continuing approval and ratification of the prior discriminatory actions practiced by Takagi constitute a continuing violation which makes his Section 1981 claim

presently actionable under the 1991 Civil Rights Act. Opp. Brief at 16–17. In the Amended Complaint, the Transfer Offer made on 2 March 1992 is alleged to be the most recent evidence of the continuing violation of Section 1981. Bermingham alternatively argues the Transfer Offer constitutes a distinct present act of discrimination actionable under the 1991 Civil Rights Act. *Id.* at 16.

When confronted with a continuing violation claim, the district court must "identify precisely the 'unlawful employment practice' of which [plaintiff] complains." *Bronze Shields, Inc. v. N.J. Dept. of Civil Serv.*, 667 F.2d 1074, 1083 (3d Cir.1981) (Title VII claim) (quoting *Delaware State College v. Ricks*, 449 U.S. 250, 257, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980), *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982)). The Third Circuit has stated:

> To prevail on a continuing violation theory, however, the plaintiff must show more than the occurrence of isolated or sporadic acts of intentional discrimination.

*Jewett v. International Telephone and Telegraph Corp.*, 653 F.2d 89, 91–92 (3d Cir.) (Title VII claim) (quoting *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981)); *see also Ricks*, 449 U.S. at 257, 101 S.Ct. at 503 (statute of limitations may be tolled by continuing violation, but "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination."); *James v. International Business Machines Corp.*, 737 F.Supp. 1420, 1424 (E.D.Pa.1990) (Title VII claim).

"The plaintiff may not base his or her claim upon conclusory allegations [that a continuing violation exists]." *Miller*, 776 F.Supp. at 953. The plaintiff must instead provide factual support "demonstrat[ing] a pattern or practice of discrimination that has continued into the present." *Cuffy v. Getty Refining & Marketing Co.*, 648 F.Supp. 802, 810 (D.Del.1986) (Section 1981 claim). "The

continuing violation theory does not cover '*isolated instances* of discrimination concluded in the past, even though the *effects* persist into the present,'" there must be a present violation. *Cuffy*, 648 F.Supp. at 810 (quoting *E.E.O.C. v. Westinghouse Elec. Co.*, 725 F.2d 211, 218 (3d Cir.1983) (emphasis in original)); *see Shafford v. Chicago Board of Ed.*, 977 F.2d 585 (7th Cir.1992) (lingering effects of illegal act insufficient for continuing violation in Section 1981 and 1983 cases).

Bermingham does not allege that he has repeatedly applied for new positions and been denied. *See Miller*, 977 F.2d at 844. He alleges, instead, that racial discrimination continues because he has remained in a position of no responsibility since he was appointed Executive Vice President in July 1991. However, "[m]ere continuity of employment" does not constitute a continuing violation. *Ricks*, 449 U.S. at 257, 101 S.Ct. at 503. Any reduction of authority experienced by Bermingham is a "lingering effect" of the allegedly discriminatory change of position in July 1991.

Bermingham points to the failure of other management level employees to intercede on his behalf as evidence of ratification and perpetuation of Takagi's improper actions. Amended Complaint, ¶ 161. He specifically refers to conversations in June 1991 with Vander Dussen, *id.*, ¶¶ 157–58, 169, Stern, *id.*, ¶¶ 145–47, and Morita,[26] *id.*, ¶¶ 165–67, as well as the 16 July Corporate Release. *Id.*, ¶ 172. Bermingham does not allege that he suffered additional injury as a result of management's failure to act, rather he acknowledges their inaction culminated in Bermingham's appointment to a new position in July 1991. *Id.*, ¶ 170. However, even if the conduct of Vander Dussen, Stern and Morita or the 16 July Corporate Release could be construed as evidence of continuous racial discrimination, the conversations and 16 July Corporate Release occurred in June and July 1991, prior to the enactment of the 1991 Civil Rights Act on 30 October 1991.

Bermingham also argues that Sony Corporation's failure to send Takagi back to Japan

---

**26.** There are no allegations that any of these three employees were able to influence or change employment decisions made by Takagi or Sony Corporation, or that the conduct of these employees was racially motivated.

for retraining, in light of his difficulty dealing with caucasians, evidences ratification of Takagi's improper actions toward Bermingham. *Id.*, ¶ 207. Sony Corporation's treatment of Takagi does not, however, constitute discriminatory conduct toward Bermingham. Bermingham does not allege he has suffered any additional discrimination as a result of Takagi's retention of position. The impact on Bermingham appears to be only that his position as Executive Vice President in the Sony Electronic Group remains unchanged. As stated above, effects which persist after a violation is concluded do not constitute a continuing violation. *Cuffy*, 648 F.Supp. at 810.

Bermingham argues that the Transfer Offer evidences a continuing violation which "relates back" to encompass the original act of discrimination by Takagi. Opp. Brief at 17. The Transfer Offer, made in March 1992, is Bermingham's only allegation of improper conduct occurring since July 1991 and after the enactment of the 1991 Civil Rights Act. However, "isolated or sporadic acts" of discrimination do not constitute a continuing violation. *Jewett*, 653 F.2d at 91–92.

■ With regard to his second assertion that the Transfer Offer also constitutes a distinct discriminatory act apart from the conduct of Takagi, the allegations in the Amended Complaint nonetheless fail to state a claim under Section 1981, as amended by the 1991 Civil Rights Act. As discussed earlier, Section 1981 provides all citizens with the right to "make and enforce contracts...." 42 U.S.C. § 1981. Congress, through the 1991 Civil Rights Act, expanded the meaning of "make and enforce contracts" to make actionable pre- and post-formation conduct which is racially discriminatory.

There are no allegations to support the assertion that the Transfer Offer was independently discriminatory. Rather, Bermingham alleges that the Transfer Offer constituted ratification by Sony Corporation of Takagi's earlier allegedly racially motivated conduct. Amended Complaint, ¶¶ 210–14. There are no allegations that Sony Corpora-

tion made the Transfer Offer because of racial animus against caucasians in general or Bermingham in particular or that it later refused to consummate the Transfer Offer because of racial animus against caucasians in general or Bermingham in particular. There are also no allegations that Bermingham accepted the transfer and was subsequently terminated because of racial animus against caucasians in general or Bermingham in particular.[27]

Notably, Bermingham does not allege that at any time after the July 1991 change in position, he was fired, that he has been unemployed, that his salary has been decreased or that he has been deprived of benefits. Instead, he argues that his authority has not been restored. Bermingham's arguments indicate only the lingering effects of Takagi's allegedly illegal conduct. Bermingham's allegations support the conclusion that only isolated and sporadic acts occurred. He has failed to adequately plead a continuing discriminatory practice or a present violation. His continuing violation theory fails; the 1991 Civil Rights Act will not control the analysis of the acts which occurred prior to the statute's enactment.

Accordingly, the Amended Complaint fails to adequately plead a continuing violation or to state a claim for discrimination under Section 1981 of the 1991 Civil Rights Act.

### 3. *Patterson and Pre-amendment Conduct*

Bermingham was hired by Sony Corporation in 1982; the alleged racially discriminatory conduct of Takagi occurred in June and July 1991; and the alleged failure to promote Bermingham occurred on 15 July 1991. As discussed earlier, *Patterson* makes actionable two types of discriminatory conduct under Section 1981: "conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal proceedings." 491 U.S. at 179–80, 109 S.Ct. at 2374. Section 1981, pre-amendment, did not extend to "problems that

---

**27.** It appears from the extensive Amended Complaint that Bermingham did not accept the Transfer Offer. It also appears that he still main-

tains his prior position as Executive Vice President of Sony Electronics.

... arise later from the conditions of continuing employment ..." and does not support a cause of action for potentially discriminatory "post[-]formation conduct" of contracting parties. *Id.* at 176–77, 109 S.Ct. at 2372–73.

To determine the scope of Section 1981, the Supreme Court distinguished at great length the roles of Section 1981 and Title VII in remedying racial discrimination. The Court, observing that discrimination claims may simultaneously arise under both Section 1981 and Title VII, stated:

> [R]efusal to enter into an employment contract on the basis of race ... would be actionable under Title VII as a "refus[al] to hire" based on race, 42 U.S.C. § 2000e–2(a), and under § 1981 as an impairment of "the same right ... to make ... contracts....," 42 U.S.C. § 1981. But this is precisely where it would make sense for Congress to provide for the overlap. At this stage of the employee-employer relation Title VII's mediation and conciliation procedures would be of minimal effect, for there is not yet a relation to salvage.

*Patterson,* 491 U.S. at 182, 109 S.Ct. at 2375. Prior to the 1991 Civil Rights Act, once the contractual relationship was formed, however, racial discrimination in the "course of employment [was] actionable [solely] under Title VII's prohibition against discrimination in the 'terms, conditions, or privileges of employment.'" *Id.* at 180, 109 S.Ct. at 2374. The Court held that Section 1981 precluded a cause of action for potentially discriminatory "post[-]formation conduct" of contracting parties. *Id.* at 177, 109 S.Ct. at 2373.

■ Accordingly, in order to state a pre-amendment claim under Section 1981 for failure to enter into a non-discriminatory employment contract, a plaintiff must establish that the (1) the employer (2) at the time of the formation of the contract (3) intentionally refused to enter into a contract on racially neutral terms. *Id.* at 184, 109 S.Ct. at 2376; *see also Carter v. Albert Einstein Medical Center,* No. 89–9106, 1990 WL 139393 *2–3,

1990 U.S.Dist. LEXIS 12548 *8–9 (E.D.Pa. 24 Sept. 1990).

Here, Bermingham, hired in 1982, does not allege that there was discriminatory conduct by Sony Corporation at the time of the formation of the contract relationship; rather, he alleges that the conduct which took place in June and July 1991 was discriminatory. These allegations demonstrate Bermingham's ability to plead racial harassment and discriminatory working conditions. As the Court in *Patterson* stated:

> The plaintiff's ability to plead that the racial harassment is 'severe or pervasive' should not allow him to bootstrap a challenge to the conditions of employment (actionable, if at all, under Title VII) into a claim under [section] 1981 that the employer refused to offer the petitioner the 'same right ... to make' a contract.

*Id.* As in *Patterson,* the conduct Bermingham alleges relates not to his "employer's refusal to enter a contract ..., but rather to the conditions of employment." *Id.* 491 U.S. at 185, 109 S.Ct. at 2377.

a. Allegations of Discriminatory Harassment

■ Significantly, the Third Circuit in *Hayes* [28] affirmed its earlier decision in *Matthews v. Freedman,* 882 F.2d 83, 85 (3d Cir. 1989) [29], where the Circuit held that on-the-job racial harassment was not actionable under Section 1981. *See Hayes,* 940 F.2d at 56 n. 4. Under the *Patterson* standard, Takagi's alleged discriminatory treatment of Bermingham during the 14 June 1991 meeting, the 17 June 1991 meeting and the 20 June 1991 meeting is not actionable under Section 1981 because it relates solely to post-contract formation discriminatory working conditions and discriminatory harassment. Accordingly, the alleged harassment and abusive work environment will not support a Section 1981 claim.

---

28. *Hayes,* 940 F.2d at 54, is discussed in greater depth in the next sub-section.

29. *Matthews,* 882 F.2d at 84, concerned an African–American woman who filed a racial discrimination law suit based upon the alleged harassment by a caucasian superior. The Third Circuit held that *Patterson* "precluded the use of section 1981 as a theory of relief in cases alleging on-the-job harassment." *Matthews,* 882 F.2d at 84.

b. Discriminatory Termination

■ In *Hayes* the Third Circuit also held that a racially motivated discharge is not actionable under Section 1981.[30] 940 F.2d at 56. In *Hayes* the plaintiff, an African–American, was an employee of the defendant for more than nineteen years. *Id.* at 55. He was discharged by the defendant for lying to his supervisor. *Id.* Thereafter the plaintiff commenced suit for wrongful termination on the basis of race and brought claims under both Section 1981 and Title VII. *Id.* The district court granted the defendant's Rule 12(b)6 motion in part. Later granted the defendant's motion for summary judgment under the standards set forth in *Patterson* that the conduct alleged was post formation conduct not actionable under Section 1981. The plaintiff appealed the discriminatory discharge issue and the Circuit affirmed the district court's holding. The Circuit explained that under *Patterson*, "job termination is clearly 'post-formation conduct' implicating performance of an existing employment contract, but not formation of a contract." *Id.* (quoting *Patterson*, 491 U.S. at 179, 109 S.Ct. at 2374).

In this case, Bermingham refers to the 15 July 1991 change in his position from President to Executive Vice President as a discharge, Amended Complaint, ¶ 189, constructive termination, *id.*, ¶ 175–76, termination, *id.*, ¶ 222, and an assignment.[31] *Id.*, ¶¶ 174–178. Significantly, Bermingham does not allege he is in fact no longer employed by Sony Corporation. It appears he remains employed by Sony Corporation in the capacity of Executive Vice President with the same salary and benefits he enjoyed in his prior position. The change in his position, regard-less of what it is termed, constitutes post-formation conduct which is not actionable under Section 1981. *See Patterson*, 491 U.S. at 179, 109 S.Ct. at 2374.

c. Right to Enforce Contracts

■ Bermingham's allegations also fail to state a claim under Section 1981 with regard to his arguments that he was denied the right to enforce his employment contract rights. Being denied access to the procedures set forth in the Employee Guidelines concerns post-formation contractual rights. The alleged denial of access to the procedures set forth in the Employment Guidelines may be a breach of his employment contract; such conduct "is precisely what the language of [Section] 1981 does not cover." *Patterson*, 491 U.S. at 183, 109 S.Ct. at 2376. These allegations, accordingly, relate to post-contract formation conduct and are not actionable under Section 1981.

Discriminatory discharges, discriminatory breaches of employment contracts, discriminatory working conditions and discriminatory harassment implicate "performance of established contract obligations" and involved post-formation discrimination issues. *Patterson*, 491 U.S. at 177, 109 S.Ct. at 2373; *see Hayes*, 940 F.2d at 56. Section 1981 does not extend relief to post-formation contract-related claims and will not support claims of employment discrimination under Section 1981.

d. Failure to Promote

■ *Patterson* does not automatically preclude claims of discriminatory failure to promote. None the less, Bermingham fails

---

**30.** Although a claim for retaliatory discharge is not asserted in the Amended Complaint, under *Patterson*, courts uniformly have held that section 1981 also does not cover claims based upon a theory of retaliatory discharge. *See, e.g., Revis*, 765 F.Supp. at 1214 ("While the Third Circuit ... has not addressed the impact of *Patterson* upon Section 1981 retaliatory discharge claims, it is evident that a retaliatory discharge is post[-]formation conduct which does not relate to the making of a contract.... Given the existing contractual relationship, a retaliatory discharge obviously is a post[-]formation event which does not impair or impede an employee's right to make a contract." (citations omitted));

*Frazier v. First Union National Bank*, 747 F.Supp. 1540, 1548 (W.D.N.C.1990) ("It appears well settled that courts have treated retaliatory conduct as post-contract conduct that is not actionable under § 1981." (citing *Overby v. Chevron USA, Inc.*, 884 F.2d 470, 473 (9th Cir.1989)); *Rathjen v. Litchfield*, 878 F.2d 836 (5th Cir. 1989)).

**31.** Bermingham, for example, describes the assignment as "... at best, a humiliating demotion and a constructive termination[, which] ... was in and of itself, a slur and a defamation ..." Amended Complaint, ¶¶ 175–77.

to allege facts to support a failure to promote claim. The Supreme Court articulated the following factors that a plaintiff needs to demonstrate to show discriminatory failure to promote: (1) that he applied for and (2) was qualified for (3) an available position for which (4) he was rejected, and (5) that after he was rejected the employer either continued to seek applicants for the position, or, filled the position. *Id.* at 186–87, 109 S.Ct. at 2377–78. A plaintiff must also demonstrate that the position sought would rise to the level of a new and distinct relationship between the employer and employee as a result of the promotion. The *Patterson* Court stated:

> [T]he question whether a promotion claim is actionable under [Section] 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under [Section] 1981.

*Id.* at 185, 109 S.Ct. at 2377. "[W]here the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer ... such a claim [is] actionable under [Section] 1981." *Id.*

The Third Circuit in *Bennun,* 941 F.2d at 169, applied the Supreme Court's analysis in *Patterson* and explained when an alleged promotion constitutes a new contract which would be actionable under Section 1981.

In *Bennun,* a Hispanic tenured associate professor, when denied a promotion to full professor, commenced an action against the defendant for violation of Section 1981 for failure to promote and for violation of Title VII for discrimination on the basis of national origin. The district court ruled in favor of the plaintiff on both claims. The defendant appealed and the Circuit reversed the district court's holding with respect to the Section 1981 failure to promote claim. The Circuit determined that the plaintiff's failure to promote claim was lacking because the position

sought did not rise to the level of a new contractual relationship between the plaintiff and defendant.

The factors the Circuit considered when making its determination of the viability of the allegation of the creation of the new contractual relationship were whether fundamental changes occurred in the rights, duties, responsibilities and compensation between the position maintained and the position sought. *Id.* at 169; *see also James,* 737 F.Supp. at 1423.

In *Bennun,* the plaintiff alleged that the change in his occupation from a tenured assistant professor to a full professor satisfied the requirements for a new contractual relationship. The Circuit determined such a change in position did not create a new contract within the meaning of *Patterson* because there was no fundamental change in the plaintiff's position. In *Bennun* the position sought by the plaintiff did not substantially change the level of responsibility or the duties to which he would be required to engage. The Circuit determined that the sole new duty as a full professor would permit the plaintiff to evaluate the candidacy of others for the full professor status. The Circuit determined that the duties and responsibilities as a full professor did not rise to a fundamental change sufficient to qualify as a new contractual relationship with the defendant. *Bennun,* 941 F.2d at 170. Because the position did not rise to a level that created a fundamental change in the duties and responsibilities of the plaintiff, the failure to promote claim was not viable under Section 1981.

Here, Bermingham alleges the change in his position from President to Executive Vice President, in July 1991, constitutes a failure to promote claim actionable under Section 1981.[32] However, his allegations do not set forth the prima facie elements to support his claim. He does not allege that he applied for an available position for which he was reject-

---

32. Although it is not explicitly clear, it is *possible* that Bermingham suffered a demotion. A demotion constitutes post-contract formation conduct which is not actionable under section 1981. *See, e.g., Mason v. General Foods Corp.,* No. 90–392, 1991 WL 255368 *1–2, 1991 U.S.Dist. LEXIS

17017 *6–7 (D.Del. 15 Nov.1991) (demotions are post-formation conduct not actionable under 42 U.S.C. § 1981); *Frazier,* 747 F.Supp. at 1547 (demotion not actionable under 42 U.S.C. § 1981).

ed. On the contrary, his allegations demonstrate that he was moved to a different position and that Takagi assumed the responsibilities of Bermingham's prior position. Bermingham fails to set forth a claim under Section 1981.[33]

Bermingham's allegations relate exclusively to conduct occurring after he was hired by Sony Corporation in 1982. Bermingham's ability to plead that Defendants' conduct is discriminatory, 'severe or pervasive,' does not state a claim under Section 1981 for refusing on a discriminatory basis to make a contract. *See Patterson,* 491 U.S. at 185, 109 S.Ct. at 2377. Count I of the Amended Complaint is dismissed for failure to state a claim upon which relief can be granted.

C. *State Law Claims: Counts II Through VIII*

The Defendants argue the remaining state law claims articulated in Count II through VIII should be dismissed for lack of supplemental (pendent) jurisdiction. Moving Brief at 23.

 The state law claims in Counts II through VIII of the exhaustively detailed sixty-five page Amended Complaint are brought before this court through the assertion of supplemental jurisdiction. Supplemental jurisdiction enables federal courts to hear state law claims over which there is no independent basis of jurisdiction. 28 U.S.C. § 1367; *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988). Supplemental jurisdiction depends upon the existence of subject matter jurisdiction over other claims in the action. Pursuant to 28 U.S.C. § 1367, "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same

case or controversy...." 28 U.S.C. § 1367(a); *see also Sinclair v. Soniform, Inc.,* 935 F.2d 599, 603 (3d Cir.1991).

Section 1367(c) permits a court to decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Carnegie–Mellon,* 484 U.S. at 350, 108 S.Ct. at 619 ("when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.") (footnote omitted); *Fuentes v. South Hills Cardiology,* 946 F.2d 196, 198 n. 3 (3d Cir.1991) (dismissal of "pendent state law claim[ ]" proper where federal claims dismissed for lack of subject matter jurisdiction).

 As discussed, Count I has been dismissed with regard to the Section 1981 claims. As well, there is no basis for a Title VII claim. Because no other ground for supplemental jurisdiction is alleged,[34] supplemental jurisdiction will no longer be exercised in this case. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); 28 U.S.C. § 1367(c)(3). The state law claims as set forth in Counts II through VIII are dismissed.[35]

*Conclusion*

For the reasons set forth above, the motion of the Defendants is granted and the Amended Complaint is dismissed.

OPINION

This employment discrimination action was brought by plaintiff John Bermingham ("Bermingham") against Sony Corporation of

---

**33.** It appears that Bermingham is disappointed in his lateral movement at Sony Corporation. Failed expectations, however, do not give rise to failure to promote claims under Section 1981 of the Civil Rights Act.

**34.** It appears diversity jurisdiction is lacking; Bermingham is a resident of New Jersey, Amended Complaint, ¶ 45; Sony America has its principal place of business in New Jersey. *Id.,* 18, 19.

**35.** Defendants also seek dismissal of the state law claims on the ground that Bermingham fails to state claims upon which relief can be granted. Moving Brief at 24–39. Because supplemental jurisdiction does not exist, it is inappropriate to decide these claims.

America, Inc. ("Sony America"), Sony U.S.A., Inc. ("Sony USA"), Sony Corporation ("Sony Japan") (collectively, the "Sony Corporation") and Shinichi Takagi ("Takagi") (collectively, the "Defendants"), pursuant to section 1981 ("Section 1981") of the Civil Rights Act of 1866 (the "Civil Rights Act"), as amended,[1] 42 U.S.C. § 1981 *et seq.*, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"), the New Jersey Law Against Discrimination (the "NJLAD"), N.J.S.A. 10:5–1 *et seq.*, and New Jersey common law. Jurisdiction appears to be appropriate pursuant to 28 U.S.C. §§ 1331, 1343 and 1367. A complaint comprising some fifty-six pages and two hundred and thirty-three paragraphs was filed on 5 March 1991 (the "Complaint"). On 16 March 1991, Bermingham filed an amended complaint comprising some sixty-two pages and two hundred and sixty-one paragraphs (the "Amended Complaint").

On 2 July 1992, Defendants filed a motion to dismiss the Amended Complaint pursuant to Fed.R.Civ.Pro. 12(b)(6) (the "Motion to Dismiss").[2] By letter-opinion and order, dated 20 November 1992 (the "20 November 1992 Opinion"), the motion to dismiss was granted. Currently before the court is the motion for reconsideration of the 20 November 1992 Opinion, filed *nunc pro tunc* on 28 December 1992, or in the alternative, for leave to file a second amended complaint.[3] For the reasons set forth below, Bermingham's motion for reconsideration, or in the alternative, for leave to file a second amended complaint, is denied.

1. The 1991 amendments to the Civil Rights Act will be referred to as the "1991 Civil Rights Act."

2. The Motion to Dismiss was filed pursuant to Rule 12N, Appendix N of the General Rules of the District Court for the District of New Jersey. The purpose of this rule is to afford the party opposing such a motion adequate time to submit opposition. Bermingham had a significant period of time during which to submit opposition and never suggested to the court the time within which to oppose was inadequate.

In support of the motion to dismiss, the Defendants submitted the following: Memorandum in Support of Defendants' Motion to Dismiss (the "Defendants' 12(b)(6) Brief") and the Reply Memorandum in Support of Defendants' Motion to Dismiss (the "Defendants' 12(b)(6) Reply Brief").

*Discussion*

### A. Motion for Reconsideration Standard of Review

Rule 59(e) of the Federal Rules of Civil Procedure permits a plaintiff to move to alter or amend a judgment within ten days of entry of an order. Fed.R.Civ.P. 59(e). Rule 12I of the General Rules of the District Court of the District of New Jersey ("General Rule 12I") requires that the moving party "set forth concisely the matters or controlling decisions which counsel believes the court has overlooked." General Rule 12I.

A motion for reconsideration or to alter or amend a judgment may be made for one of three reasons: "(1) [A]n intervening change in the controlling law has occurred, (2) evidence not previously available has become available, or (3) it is necessary to correct a clear error of law or prevent manifest injustice." *Weyerhaeuser Corp. v. Koppers Co.*, 771 F.Supp. 1406, 1419 (D.Md.1991) (citing *Natural Resources Defense Council v. U.S. E.P.A.*, 705 F.Supp. 698, 702 (D.D.C.), *vacated on other grounds*, 707 F.Supp. 3 (D.D.C. 1989)); *see also Macario v. Pratt & Whitney Canada, Inc.*, No. 90–3906, 1991 WL 98902 *2, 1991 U.S. Dist. LEXIS 7429 *4–5 (E.D.Pa. 4 June 1991).

A motion for reconsideration is not a vehicle to reargue the motion or to present evidence which should have been raised before. *Weyerhaeuser*, 771 F.Supp. at 1419. "A party seeking reconsideration must show more than a disagreement with the Court's decision, and 'recapitulation of the cases and

In opposition to this motion, Bermingham submitted: Memorandum of Law in Opposition to Defendants' Motion to Dismiss (the "Bermingham 12(b)(6) Opposition Brief").

3. In support of this motion, Bermingham submitted the following: Plaintiff's Memorandum of Law in Support of Application for Reargument and For Leave to Amend ("Bermingham 12I Brief"); Affidavit of Robert E. Goldman, Esq. including as Ex. A proposed second amended complaint; Reply Memorandum of Law (the "12I Reply Brief").

In opposition to the motion, Defendants submitted: Memorandum in Opposition to Motion for Reargument (the "12I Opposition Brief").

For a complete recitation of the facts, *see* 20 November 1992 Opinion at 838–46.

arguments considered by the court before rendering its original decision fails to carry the moving party's burden.'" G–69 v. Degnan, 748 F.Supp. 274, 275 (D.N.J.1990) (quoting Carteret Savings Bank, F.A. v. Shushan, 721 F.Supp. 705, 709 (D.N.J.1989)). See also Egloff v. New Jersey Air Nat. Guard, 684 F.Supp. 1275, 1279 (D.N.J.1988) (motion for reconsideration denied where plaintiff failed to cite any pertinent case law or fact court may have overlooked). Where the motion raises only a party's disagreement with a decision of the court, that dispute "should be dealt with in the normal appellate process, not on a motion for reargument under ... [General] Rule 12I." Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F.Supp. 159, 163 (D.N.J.1988).

Bermingham alleges controlling principles of law were misconstrued in the 20 November 1992 Opinion. He challenges two aspects of the 20 November 1992 Opinion: the standard of review for a motion to dismiss applied by the court and the analysis of Bermingham's Section 1981, pre- and post-amendment, employment discrimination claim. Bermingham 12I Brief at 1.

### 1. Standard for Rule 12(b)(6) Motion to Dismiss

In the Bermingham 12I Brief, the standard of review for a motion to dismiss is discussed. Bermingham 12I Brief at 1–4. However, Bermingham merely reiterates the standard set forth in the 20 November 1992 Opinion. 20 November 1992 Opinion at 846. Bermingham asserts that, in analyzing a motion to dismiss, the allegations in the Complaint must be taken as true. Bermingham 12I Brief at 1. The 20 November 1992 Opinion stated: "For the purposes of this opinion, the facts alleged in [the Amended] Complaint are taken to be true." 20 November 1992 Opinion at 838, n. 8.

Bermingham asserts the allegations must be liberally viewed and inferences drawn in favor of the plaintiff. Bermingham 12I Brief

at 1. The 20 November 1992 Opinion stated: "[A]ll allegations in the [Amended C]omplaint must be ... viewed in the light most favorable to the plaintiff." 20 November 1992 Opinion at 846. Bermingham asserts a complaint should be dismissed if it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of his claim. Bermingham 12I Brief at 1. The 20 November 1992 Opinion stated: "A court may dismiss for failure to state a claim where it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations." 20 November 1992 Opinion at 846.

Finally, Bermingham cites Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), as the controlling case. Bermingham 12I Brief at 1. Conley was expressly relied upon in the 20 November 1992 Opinion. 20 November 1992 Opinion at 846. Accordingly, Bermingham has not raised any controlling authority affecting the analysis of a motion to dismiss overlooked by the 20 November 1992 Opinion and has failed to provide a basis for reconsideration.

Bermingham asserts the allegations in the Amended Complaint satisfied the requirement of a short plain statement of the claim. He contends that through the allegations of specific conduct, Defendants were placed on notice as to which rights were violated, the time and place of the conduct and the identity of the specific people responsible. Bermingham 12I Brief at 2. He asserts he does not bear a burden to set forth, in the Amended Complaint, all the facts upon which he intends to prove his case or to plead additional facts to those in the Amended Complaint to withstand a motion to dismiss. Id. at 3. Bermingham contends a complaint should not be dismissed where discovery will yield evidence to support the complaint.[4] Id. at 3–4 (quoting Bogosian v. Gulf Oil Corp., 561 F.2d 434, 445–46 (3d Cir.1977)).

It is undisputed Bermingham set forth extensive factual allegations in the

---

4. Bermingham also quotes Frazier v. Southeastern Pennsylvania Transportation Authority, 785 F.2d 65, 68 (3d Cir.1986): "[I]n [certain cases] ... much of the evidence can be developed only through discovery." Bermingham 12I Brief at 4.

However, the portion of the text omitted in Bermingham's quotation indicates that it is "civil rights cases, especially class actions" where discovery yields much of the evidence.

Amended Complaint. The 20 November 1992 Opinion specifically observed that the Amended Complaint "is over sixty pages long and sets forth more than two hundred and sixty paragraphs of allegations." 20 November 1992 Opinion at 837, n. 1. However, notice pleading does not relieve Bermingham of the obligation to set forth allegations that state a cause of action. The 20 November 1992 Opinion did not hold that Bermingham failed to *prove* his claim. Rather, the 20 November 1992 Opinion fully and carefully considered all the allegations in the Amended Complaint and held·that Bermingham's allegations, and any other facts which Bermingham could put forth consistent with the Amended Complaint,[5] did not, and could not, *state* a claim under Title VII or Section 1981 (pre and post-amendment).

Bermingham asserts the 20 November 1992 Opinion erroneously relied, in a string-cite at 846, on *Briscoe v. LaHue*, 663 F.2d 713 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), for the proposition that "legal conclusions made in the guise of factual allegations are not given the presumption of truthfulness."[6] 20 November 1992 Opinion at 846. In *Briscoe*, the court rejected the plaintiff's allegations of conspiracy because the "recitation of legal conclusions [was] wholly devoid of facts upon which a claim for relief can be based." 663 F.2d at 723. *Briscoe* supports the proposition included in the 20 November 1992 Opinion; reliance on *Briscoe* does not provide a basis for reconsideration.

5. Any acts of discrimination by Defendants would have been experienced by Bermingham personally; accordingly, it is unlikely discovery would contribute new or additional instances of discriminatory conduct heretofore unknown to Bermingham.

6. Bermingham does not challenge the correctness of the 20 November 1992 Opinion's statement of law, rather he appears to argue that one of the four cases cited does not support the statement of law.

7. Paragraph 214 states:
 [T]he acts of the ... Defendants in offering ... Bermingham other positions and contractual arrangements is [sic] a continuing ratification and approval of the acts of the Defendant,

### 2. *Section 1981*

■ Bermingham asserts the 20 November 1992 Opinion, at 848–50, erroneously considered whether the 1991 Civil Rights Act should be applied retroactively. Bermingham 12I Brief at 4–5. However, in the opposition to the motion to dismiss, Bermingham argued that the 1991 Civil Rights Act applied retroactively. Bermingham 12(b)(6) Opposition Brief at 19 n. 18. In response to the argument raised by Bermingham, the 20 November 1992 Opinion considered and rejected retroactive application of the amendments. 20 November 1992 Opinion at 848–50.

Bermingham asserts that because discriminatory conduct occurred after the enactment of the amendments, he states a cause of action under the 1991 Civil Rights Act. Bermingham 12I Brief at 5. He refers to paragraph 214 of the Amended Complaint which described Sony Corporation's offer to transfer Bermingham to California (the "Transfer Offer").[7]

This argument was, however, raised by Bermingham in opposition to the Motion to Dismiss and considered in the 20 November 1992 Opinion. 20 November 1992 Opinion at 852. It was specifically considered whether the Transfer Offer "constitute[d] a distinct discriminatory act apart from the conduct of Takagi" for the purposes of the 1991 Civil Rights Act. *Id.* at 851–52. The 20 November 1992 Opinion, however, explained that the Transfer Offer appears to be only an allegation of a ratification by Sony Corporation of Takagi's earlier allegedly racially motivated conduct.

> Takagi, and is [sic] so contaminated by the racial discrimination practiced by Japanese management against a Caucasian subordinate as to, itself, constitute, in and of itself, insidious illegal discrimination premised upon race. Amended Complaint, ¶ 214. Paragraph 214 sets forth a legal conclusion as to what constitutes an act of discrimination, without supporting factual allegations. Accordingly, the assertions need not be accepted as true. *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 2944, 92 L.Ed.2d 209 (1986); *Haase v. Webster*, 807 F.2d 208, 215 (D.C.Cir.1986); *Briscoe*, 663 F.2d at 723; *Western Mining Council v. Watt*, 643 F.2d 618, 626 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).

There are no allegations that Sony Corporation made the Transfer Offer because of racial animus against caucasians in general or Bermingham in particular or that it later refused to consummate the Transfer Offer because of racial animus against caucasians in general or Bermingham in particular. There are also no allegations that Bermingham accepted the transfer and was subsequently terminated because of racial animus against caucasians in general or Bermingham in particular.

*Id.* at 852. Because applicability of the 1991 Civil Rights Act to the Transfer Offer was fully considered, Bermingham has failed to establish this as a basis for reconsideration.

 Bermingham asserts the court erred by considering the allegations in the context of a continuing violation theory because "each act by the Defendants constitute[s] both an independent discriminatory act *and* a furtherance of a plan premised upon racial animus."[8] Bermingham 12I Brief at 6. Bermingham also asserts the 20 November 1992 Opinion erred by relying on cases which discussed continuing violations in the context of the avoidance of the statute of limitations. Bermingham 12I Brief at 6.

Bermingham, however, argued in opposition to the Motion to Dismiss that "[w]hile the doctrine of 'continuing violation' usually arises in the statute of limitations context, not here applicable, the theory is equally applicable in bridging the gap between [section] 1981 (post-*Patterson* ) and as amended." Bermingham 12(b)(6) Opposition Brief at 16 n. 16. The statute of limitation cases relied upon in the 20 November 1992 Opinion provide analogous circumstances and analysis to the theory of continuing violation espoused. The 20 November 1992 Opinion addressed the adequacy of the allegations under a theory of continuing violation, 20 November 1992 Opinion at 850–52, and as independently discriminatory conduct, both pre and post-amendment. 20 November 1992 Opinion at 852–55.

Bermingham contends the 20 November 1992 Opinion erroneously relied upon *Miller v. Aluminum Company of America,* 679 F.Supp. 495 (W.D.Pa.), *aff'd,* 856 F.2d 184 (3d Cir.1988), and *Churchill v. International Business Machines, Inc., Nat. Service Div.,* 759 F.Supp. 1089, 1106 (D.N.J.1991), because they involved motions for summary judgment. In addition, Bermingham argues *Churchill* is inapplicable because he did not rely on a theory of constructive discharge, but was "*terminated* and . . . offered a new but drastically different contractual relationship based upon racial discrimination." Bermingham 12I Brief at 7 (emphasis Bermingham's).

Although Bermingham presently denies that he relied on a theory of constructive discharge, the Amended Complaint contained allegations of constructive termination. Amended Complaint, ¶ 111 ("[Defendants] actually and constructively terminated from his position of authority. . . ."); *see also* ¶¶ 175–76. The 20 November 1992 Opinion properly referred to *Miller* and *Churchill,* in a footnote in the statement of facts, to illustrate factual situations which constitute constructive discharge. 20 November 1992 Opinion at 842–43 n. 18. However, as discussed in the 20 November 1992 Opinion, even if Bermingham had been constructively terminated, the change in position occurred prior to enactment of the 1991 Civil Rights Act and constitutes post-formation conduct not actionable under Section 1981. 20 November 1992 Opinion at 853–54.

Bermingham argues the 20 November 1992 Opinion erred by stating: "Bermingham does not allege that he has repeatedly applied for new positions and been denied." Bermingham 12I Brief at 8 (quoting 20 November 1992 Opinion at 851). Bermingham asserts that his day to day requests for reinstatement are evidence of a continuing violation, as discussed in *Lewis v. Local Union*

---

8. Bermingham contends the 20 November 1992 Opinion erred by characterizing the allegations as "sporadic and isolated." Bermingham 12I Brief at 6. On a motion pursuant to Rule 12I, a party may alert the court to "matters or controlling decisions which counsel believes the Court has overlooked." General Rule 12I. Disagreement with a considered statement of the court is not a basis for reconsideration. *Florham Park Chevron,* 680 F.Supp. at 163; *G–69,* 748 F.Supp. at 275.

*no. 100 of Laborers' Intern. Union*, 750 F.2d 1368, 1378–79 (7th Cir.1984). Bermingham 12I Brief at 8.

*Lewis* was discussed in the Bermingham 12(b)(6) Opposition Brief at 17–18 and the Defendants' 12(b)(6) Reply Brief at 8 n. 9, and considered in preparation of the 20 November 1992 Opinion. *Lewis* involved a labor relations claim where the plaintiff was deprived of employment as a result of the actions of the union. Bermingham, however, alleged employment discrimination based on his employer's failure to restore him to his former position. Because *Lewis* should be distinguished on its facts, the case was not referred to in the 20 November 1992 Opinion.

The 20 November 1992 Opinion, furthermore, considered the allegations regarding the Defendants' refusal to restore Bermingham's authority. 20 November 1992 Opinion at 852. At all times, Bermingham remained employed by the Sony Corporation. Because "[m]ere continuity of employment" does not constitute a continuing violation, *Delaware State College v. Ricks*, 449 U.S. 250, 257, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980), Bermingham failed to state a claim under the 1991 Civil Rights Act under a theory of continuing violation.

Bermingham also objects to the observation in the 20 November 1992 Opinion that "Bermingham does not allege … that any racially biased statements were made or that such documents exist." Bermingham 12I Brief at 8; 20 November 1992 Opinion at 845–46. He claims: "This is not true." Bermingham 12I Brief at 8. Bermingham, however, fails to point to any allegations in the Amended Complaint to refute the statement. Instead, he refers to the statements by other caucasian managers, included in the 20 November 1992 Opinion at 844–45, which indicate concern over his situation. Although Bermingham need not allege *all* evidentiary facts that support his claim, he "is required to allege facts to support his claim and the absence of any racial comments or documents is another omission which further

demonstrates the lack of viability of Bermingham's claim." [9] 12I Opposition Brief at 10.

▉ Bermingham disputes the characterization of his change in position as a "lateral movement" or "possible demotion." Bermingham 12I Brief at 9. Instead Bermingham asserts the mandatory favorable inference is that he was terminated and presented an offer to enter a new contractual relationship actionable under Section 1981. *Id.* The 20 November 1992 Opinion carefully considered these arguments when originally presented by Bermingham in opposition to the Motion to Dismiss. 20 November 1992 Opinion at 854–55. Although Bermingham objects to the Court's reliance on *Mason v. General Foods Corp.*, No. 90–392, 1991 WL 255368 *1–2, 1991 U.S.Dist. LEXIS 17017 *6–7 (D.Del. 15 Nov. 1991) and *Frazier v. First Union National Bank*, 747 F.Supp. 1540, 1548 (W.D.N.C.1990), for the proposition that a demotion constitutes post-contract formation conduct not actionable under section 1981, he does not refer to any contradictory controlling caselaw. Bermingham has failed to establish this as a basis for reconsideration.

Bermingham contends the 20 November 1992 Opinion overlooked *Perry v. Command Performance*, 913 F.2d 99 (3d Cir.1990). Bermingham 12I Brief at 10. Bermingham argued the applicability of *Perry* in opposition to the motion to dismiss, Bermingham 12(b)(6) Opposition Brief at 7; Defendants distinguished it in their reply brief. Defendants' 12(b)(6) Reply Brief at 5. *Perry* was considered in preparation of the 20 November 1992 Opinion. It was not referred to because it was inapplicable; it is not an employment discrimination case and does not involve claims of promotion or demotion.

▉ In this motion, Bermingham refers to the same state court cases, dealing with the creation of a new contract under common law contract principles, raised in opposition to the motion to dismiss. Berm-

---

**9.** Bermingham requests to have the statement concerning the absence of racially biased statements and documents, as well as the statement that "Bermingham experienced a personality conflict," stricken from the 20 November 1992 Opinion. Bermingham 12I Brief at 9, n. 7. There is no basis for this request.

ingham 12I Brief at 10–11; Bermingham 12(b)(6) Opposition Brief at 4–6. Those cases are, however, inapplicable. The standard for creating a new contract under state common law is not compatible to an analysis of post contract formation conduct under Section 1981. Under state law contact, acceptance by an employee of any terms modified by the employer creates a new and different contract. Bermingham 12(b)(6) Opposition Brief at 5 (quoting *Summers v. Ralston Purina Co.*, 260 Ala. 166, 69 So.2d 858, 862 (1954)). However, the law in the Third Circuit considering Section 1981 violations requires fundamental changes in rights, duties, responsibilities and compensation in order to rise to the level of a new contractual relationship between employer and employee. 20 November 1992 Opinion at 855; *Bennun v. Rutgers State University*, 941 F.2d 154, 168 (3d Cir.1991); *James v. International Business Machines Corp.*, 737 F.Supp. 1420, 1424 (E.D.Pa.1990). The allegations regarding rights, duties, responsibilities and compensation were carefully considered; it was concluded Bermingham had failed to state a claim for termination and refusal to enter a new contract actionable under Section 1981. Disagreement with this analysis, without providing facts or controlling decisions [10] which were overlooked, fails to establish a basis for reconsideration.

---

10. Bermingham relies on *Kriegel v. Home Insurance Co.*, 739 F.Supp. 1538 (N.D.Ga.1990), *Kozam v. Emerson Electric Co.*, 739 F.Supp. 307 (N.D.Miss.1990) *aff'd*, 928 F.2d 401 (5th Cir. 1991), *Williams v. Avco Lycoming, Div. of Textron, Inc.*, 755 F.Supp. 47, 51 (D.Conn.1991), and *Gersman v. Group Health Ass.*, 931 F.2d 1565, 1573 (D.C.Cir.1991) *vacated*, ── U.S. ──; 112 S.Ct. 960, 117 L.Ed.2d 127 (1992), Bermingham 12I Brief at 11–12, as he did in opposition to the motion to dismiss. Bermingham 12(b)(6) Opposition Brief at 6, 8–9. These cases were considered; they are inconsistent with Third Circuit caselaw.

As *Kriegel* acknowledges: "The majority of decisions construing *Patterson* have concluded that all employment discrimination claims based on post-formation conduct, with the exception of substantial promotion and interference with the right to enforce contracts through legal process, are no longer actionable under [Section] 1981." 739 F.Supp. at 1539. Because the Third Circuit has held that discriminatory discharge claims constitute post contract formation conduct and are unactionable under Section 1981, *Hayes v.*

## B. Leave to Amend

In the alternative, Bermingham seeks leave to file a *second* amended complaint. Bermingham 12I Brief at 13. He contends:

It is unfair for the Court to state that [Bermingham] has not sought to amend his [Amended] Complaint to incorporate matters contained in the "Statement of Facts" of [the Bermingham 12(b)(6) Opposition Brief] for the Court stated unequivocally during oral argument that it would not consider a motion to amend the pleadings, chastised counsel for including a statement of Facts,[11] and then assumed for the purposes of its decision that no further facts exist as a result of [Bermingham's] failure to seek leave to amend.

*Id.* In point of fact, Bermingham sought leave to file a second amended complaint only after the 20 November 1992 Opinion was issued.

At oral argument, on 24 July 1992, it was recognized that Bermingham had already amended the complaint once and would not be given yet another opportunity to amend. Tr. at 3. Counsel for Bermingham acquiesced and responded: "I understand that." *Id.* At the time the Amended Com-

---

*Community General Osteopathic Hospital*, 940 F.2d 54 (3d Cir.1991), *cert. denied*, ── U.S. ──, 112 S.Ct. 940, 117 L.Ed.2d 110 (1992), claims for discriminatory demotion are also unactionable under Section 1981. 20 November 1992 Opinion at 853, 854, n. 32.

In addition, the 20 November 1992 Opinion fully considered and rejected Bermingham's contention that the allegations in the Amended Complaint state a claim for refusal, by Sony Corporation, to enter a new and distinct contractual relationship. 20 November 1992 Opinion at 854–55. Despite rejecting the legal theory of discriminatory demotion under Section 1981 and it appearing Bermingham was never terminated, 20 November 1992 Opinion at 842–43, n. 18, 847, n. 21, 851, n. 27, the issue of a new contractual relationship was addressed.

11. The direction to counsel for Bermingham, regarding the format of the Bermingham 12(b)(6) Opposition Brief, concerned the improper inclusion of a preliminary statement, not a statement of facts. Tr. at 4, 6. "In the future, I would appreciate when I receive a brief, in not receiving a preliminary statement." *Id.* at 4.

plaint had been filed for more than four months.

Bermingham contends leave to file a second amended complaint should be routinely granted pursuant to Fed.R.Civ.Pro. 15(a), even after judgment of dismissal has been entered. Bermingham 12I Brief at 13. In this regard, the Supreme Court stated:

> [T]he grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

This is not a situation where there was an outright refusal to grant leave to file an amended complaint. The basis for the denial is obvious. The initial Complaint was not a simple Rule 8 notice pleading. The Complaint in this matter was filed on 5 March 1992 and consisted of fifty-six pages and two hundred and thirty-three paragraphs. On 16 March 1992, Bermingham filed an even more extensive Amended Complaint which consisted of sixty-two pages and two hundred and sixty-one paragraphs.

Bermingham had many opportunities to seek to file another amended complaint. More than two months after the Amended Complaint was filed, Bermingham was served with the Defendants' Comprehensive Motion to Dismiss and Defendants' 12(b)(6) Brief on 22 May 1992.[12] After receiving the Motion to Dismiss and its supporting briefs on 22 May 1992 and after an opportunity to research and consider the arguments raised by Defendants, Bermingham did not seek

leave to further amend his Amended Complaint. On the contrary, after a full opportunity to deliberate with regard to the Motion to Dismiss, Bermingham chose to file an opposition brief. Bermingham's opposition brief was served on Defendants on 18 June 1992.

Again, after serving the Bermingham 12(b)(6) Opposition Brief on 18 June 1992 and before receiving the Defendants' 12(b)(6) Reply Brief on 1 July 1992, Bermingham never sought to file a second amended complaint. During the period between Bermingham's receipt of the Reply Brief and oral argument on 24 July 1992, Bermingham never sought leave to file a second amended complaint.

As mentioned, at oral argument, it was recognized Bermingham already had the opportunity to and did in fact file an amended complaint. Counsel was further advised Bermingham would not be given yet another opportunity to amend and, as stated, counsel for Bermingham acquiesced in this comment. Following oral argument and for the four-month period between the oral argument and the issuance of the 20 November 1992 Opinion, Bermingham *never* sought leave to file a second amended complaint.

At no point during the eight months between the filing of the Amended Complaint and the issuance of the 20 November 1992 Opinion did Bermingham avail himself of the opportunity to seek leave to further amend the Amended Complaint. Instead, despite the shortcomings raised by the Motion to Dismiss, Bermingham chose to stand on the Amended Complaint.

The policy advocated by Bermingham suggests a process under Rule 12(b)(6) that could go on indefinitely.[13] In effect, Berm-

---

12. The Motion to Dismiss was filed pursuant to Rule 12N, Appendix N of the General Rules of the District Court for the District of New Jersey. Rule 12N and Appendix N, the Dispositive Motion Procedure, were designed to provide the attorney opposing a dispositive motion enough time within which to draft opposition and further allow the attorneys the opportunity to file such a motion consistent with their own schedules. At no point in this process did either Defendants or Bermingham communicate with the court to indicate or suggest either did not have enough time to prepare moving, opposition or reply papers.

13. Bermingham's tactic of delay in seeking to further amend the Amended Complaint fits squarely under 28 U.S.C. § 1927. By failing to pursue many opportunities to file a second amended complaint and forcing counsel and the court to litigate the Motion to Dismiss, it appears Bermingham multiplied "the proceedings ... unreasonably and vexatiously." *Id.*

If there was a basis to file yet a second amended complaint in this case, there was more than ample opportunity to bring it to the attention of counsel and the court before all of this work was

ingham advocates that he be permitted to file another amended complaint each time a Rule 12(b)(6) motion is successful. Bermingham had a full and fair opportunity to set forth his cause of action. He has not stated a Federal cause of action. Significantly, supplemental jurisdiction was not exercised; the state causes of action were not addressed. Bermingham has the opportunity to pursue these matters in state court.

Conclusion

For the reasons set forth above, Bermingham's motion for reconsideration, or in the alternative, for leave to file a second amended complaint, is denied.

required. Had counsel for Bermingham sought leave to file yet a second amended complaint after receipt of the Motion to Dismiss and its supporting papers, a very significant amount of work on the part of all counsel and the court could have been avoided. As mentioned, this course of conduct was not followed. On the contrary, it appears counsel for Bermingham stubbornly clung to the Amended Complaint after full notice of what Defendants considered to be an inadequate pleading. If it is the policy in this Circuit that Bermingham should nevertheless be given leave to now file a second amended complaint, counsel should "be required by the court to satisfy personally the excess cost, expenses, and attorneys' fees reasonably incurred because of such conduct." *Id.*

The observation in this footnote is not meant to suggest that because of the vexatious conduct of counsel, plaintiff should be placed at a disadvantage. Rather, it is intended to afford Rule 12(b)(6) some content and to recognize the purpose of its design—dismissal of a complaint for failure to state a claim, especially when the plaintiff has been given many opportunities to cure a defective complaint.